01

02

03

04

05                                    UNITED STATES DISTRICT COURT
                                  FOR THE EASTERN DISTRICT OF CALIFORNIA

06   JAVERT LADELL SILLER,                      )
                                                )
07            Petitioner,                       )     CASE NO. 2:07-cv-00641-RSL-JLW
                                                )
08        v.                                    )
                                                )
09   D.K. SISTO, Warden,                        )     REPORT AND RECOMMENDATION
                                                )
10            Respondent.                       )
     _____ )

11

12        I.      SUMMARY

13            Petitioner Javert Siller is currently incarcerated at the California State Prison, Solano

14   in Vacaville, California.  He was convicted of second degree murder with a firearm

15   enhancement in Contra Costa County Superior Court on September 27, 1982, and sentenced

16   to 17-years-to-life with the possibility of parole.  He has filed a petition for writ of habeas

17   corpus, together with relevant portions of the state court record, under 28 U.S.C. § 2254

18   challenging his 2006 denial of parole by the Board of Parole Hearings of the State of

19   California (the "Board").[1]  (*See* Docket 1, Exhibits A-L.)  Respondent has filed an answer to

20   the petition, and petitioner has filed a response in reply to the answer.  (*See* Dkt. 13; Dkt. 14.)

21   Petitioner has also filed a separate habeas petition challenging the Board's 2008 parole denial,

22

_____

          [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
2005.  *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION - 1

01   relevant portions of the state court record, and a motion to proceed *in forma pauperis*.  (*See*

02   Dkt. 18, Exs. A-H; Dkt. 19.)  The Court, having thoroughly reviewed the record and briefing

03   of the parties, recommends the Court deny both petitions, and dismiss this action with

04   prejudice.

05       II.   BACKGROUND

06       Petitioner and his estranged wife, Denise, separated in November 1981.  (*See* Dkt. 1,

07   Ex. A at 6-7.)  On December 31, 1981, petitioner was on his way to a New Year's Eve party

08   with his brother and niece when Denise called and invited petitioner to stay at her place for

09   the evening with their two-and-a-half-year-old son, Traval.  (*See id.*)  Petitioner complied

10   with her request, and spent the night with Denise.  (*See id.*)  He claims that he was carrying a

11   loaded .32 caliber Harrington & Richardson revolver on his person that evening because he

12   had originally planned to shoot the gun in celebration at midnight, although he never fired it

13   that night.  (*See id.* at 6 and 10.)

14       At approximately 8:00 a.m. the next morning, petitioner and Denise were awakened

15   by a phone call from one of Denise's male friends.  (*See id.* at 7.)  When Denise answered the

16   phone, she stated that petitioner was present.  (*See id.*)  After the phone call, she asked

17   petitioner to leave, and he refused.  (*See id.*)  An argument ensued, and Denise picked up a

18   steak knife and attempted to stab petitioner.  (*See id.*)  Petitioner initially prevented her from

19   stabbing him by grabbing her by the wrists, but then released her and encouraged her to stab

20   him.  (*See id.*)  In response, Denise stabbed petitioner in the chest, causing a superficial

21   wound.  (*See id.*)  A witness who had spent the previous night sleeping on the couch in the

22   house intervened by separating petitioner and Denise, and removing the steak knife from her

     grasp.  (*See id.*)  Petitioner then dressed their son, and took him to the car.  (*See id.* at 7-8.)

REPORT AND RECOMMENDATION - 2

01        When petitioner's car would not start, petitioner went back to the residence to ask the

02   witness for assistance with a jumpstart.  (*See id*. at 8.)  Denise then informed petitioner that

03   she had summoned the police because of petitioner's behavior that morning.  (*See id*.)  While

04   holding his child, petitioner drew his revolver and fired two shots at Denise, striking her in the

05   right eye and neck, and killing her.  (*See id*.)  When police arrived, petitioner took his child

06   into the backyard.  (*See id*.)  Petitioner threatened to kill himself, and also held the gun to his

07   child's side while he sat in the backyard.  (*See id*.)  After police talked petitioner into

08   relinquishing his weapon, he was taken into custody.  (*See id*.)

09        During the 2006 hearing, petitioner told the panel that he had not been holding his

10   child at the time he shot his wife, because he had left him alone in the car.  (*See id*.)  He also

11   admitted threatening to commit suicide following the shooting, but denied endangering his

12   son's life.  (*See id*. at 9.)  Petitioner claimed the witnesses were mistaken about these aspects

13   of the offense.  (*See id*.)

14        The commitment offense occurred when petitioner was twenty-seven-years-old.  (*See*

15   Dkt. 1 at 1.)  Petitioner was convicted of second degree murder with a firearm enhancement,

16   and sentenced to 17-years-to-life with the possibility of parole.  (*See id.*, Ex. A at 1.)  His

17   minimum eligible parole date was set for April 12, 1992.  (*See id*.)  The parole denial which is

18   the subject of the first habeas petition in this case took place after petitioner's eighth overall

19   parole consideration hearing on January 24, 2006.  (*See id*. at 16.)  The second petition in this

20   case challenges the Board's parole denial on April 29, 2008, following his ninth overall parole

21   consideration hearing.  (*See* Dkt. 18, Ex. A at 1.)  As of the date of the 2006 parole hearing,

22   petitioner was fifty-one-years-old and had been in custody for twenty-four years.

01        After denial of his 2006 and 2008 applications, petitioner filed habeas corpus petitions

02    in the Contra Costa County Superior Court, California Court of Appeal, and California

03    Supreme Court.  (*See* Dkt. 1, Exs. I and J; Dkt. 3, Exs. 3-5; Dkt. 18, Ex. H.)  Those petitions

04    were unsuccessful.  (*See id*.)  His federal habeas petitions followed.  Petitioner contends his

05    2006 and 2008 denials by the Board violated his Fifth and Fourteenth Amendment Due

06    Process rights.  Thus, petitioner does not challenge the validity of his conviction, but instead

07    challenges the Board's 2006 and 2008 decisions finding him unsuitable for parole.

08        III.    STANDARD OF REVIEW

09        The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

10    petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

11    320, 326-27 (1997).  Because petitioner is in custody of the California Department of

12    Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

13    vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

14    *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

15    petition by a state prisoner in custody pursuant to a state court judgment, even when the

16    petitioner is not challenging his underlying state court conviction.").  Under AEDPA, a

17    habeas petition may not be granted with respect to any claim adjudicated on the merits in state

18    court unless petitioner demonstrates that the highest state court decision rejecting his petition

19    was either "contrary to, or involved an unreasonable application of, clearly established

20    Federal law, as determined by the Supreme Court of the United States," or "was based on an

21    unreasonable determination of the facts in light of the evidence presented in the State court

22    proceeding."  28 U.S.C. § 2254(d)(1) and (2).

01        As a threshold matter, this Court must ascertain whether relevant federal law was

02   "clearly established" at the time of the state court's decision.  To make this determination, the

03   Court may only consider the holdings, as opposed to dicta, of the United States Supreme

04   Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

05   precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

06    331 F.3d 1062, 1069 (9th Cir. 2003).

07        The Court must then determine whether the state court's decision was "contrary to, or

08   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.

09   Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

10   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

11   Supreme] Court on a question of law or if the state court decides a case differently than [the]

12   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

13   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

14   state court identifies the correct governing legal principle from [the] Court's decisions but

15   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

16   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

17   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

18   established federal law erroneously or incorrectly.  Rather that application must also be

19   [objectively] unreasonable."  *Id.* at 411.

20        In each case, the petitioner has the burden of establishing that the state court decision

21   was contrary to, or involved an unreasonable application of, clearly established federal law.

22   *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

     whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

REPORT AND RECOMMENDATION - 5

01  state court decision because subsequent unexplained orders upholding that judgment are

02  presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

03  (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

04          Finally, AEDPA requires federal courts to give considerable deference to state court

05  decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

06  Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

07  *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

08  (9th Cir. 1993)).

09          IV.      FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

10          A.      *Due Process Right to be Released on Parole*

11          Under the Fifth and Fourteenth Amendments to the United States Constitution, the

12  government is prohibited from depriving an inmate of life, liberty or property without the due

13  process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

14  analyzed in two steps: the first asks whether the state has interfered with a constitutionally

15  protected liberty or property interest of the prisoner, and the second asks whether the

16  procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of*

17  *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

18  1123, 1127 (9th Cir. 2006).

19          Accordingly, our first inquiry is whether petitioner has a constitutionally protected

20  liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

21  *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

22  U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

"the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

REPORT AND RECOMMENDATION - 6

01  The Court in *Greenholtz* determined that although there is no constitutional right to be

02  conditionally released on parole, if a state's statutory scheme employs mandatory language

03  that creates a presumption that parole release will be granted if certain designated findings are

04  made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

05  12; *Allen*, 482 U.S. at 377-78.

06        As discussed *infra*, California statutes and regulations afford a prisoner serving an

07  indeterminate life sentence an expectation of parole unless, in the judgment of the parole

08  authority, he "will pose an unreasonable risk of danger to society if released from prison."

09  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

10  parole scheme gives rise to a cognizable liberty interest in release on parole."  *McQuillion*,

11  306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

12  that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

13  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

14  release date, a liberty interest that is protected by the procedural safeguards of the Due

15  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

16  upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

17  *Sass*, 461 F.3d at 1127.

18        Because the Board's denial of parole interfered with petitioner's constitutionally-

19  protected liberty interest, this Court must proceed to the second step in the procedural due

20  process analysis and determine whether the procedures accompanying that interference were

21  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

22  board's decision deprives a prisoner of due process with respect to this interest if the board's

    decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

01 *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

02 applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

03 Court to determine "whether there is any evidence in the record that could support the

04 conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

05 involved the accumulation of good time credits rather than release on parole, later cases have

06 held that the same constitutional principles apply in the parole context because both situations

07 directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

08 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

09 Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at

10 915; *McQuillion*, 306 F.3d at 904.

11        "The fundamental fairness guaranteed by the Due Process Clause does not require

12 courts to set aside decisions of prison administrators that have some basis in fact," however.

13 *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

14 the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

15 455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

16 *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

17 habeas review when it upheld the finding of the prison administrators despite the Court's

18 characterization of the supporting evidence as "meager."  *See id.* at 457.

19        B.      *California's Statutory and Regulatory Scheme*

20        In order to determine whether "some evidence" supported the Board's decision with

21 respect to petitioner, this Court must consider the California statutes and regulations that

22 govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

Board is authorized to set release dates and grant parole for inmates with indeterminate

REPORT AND RECOMMENDATION - 8

01  sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq*.  Section 3041(a) requires the Board

02  to meet with each inmate one year before the expiration of his minimum sentence and

03  normally set a release date in a manner that will provide uniform terms for offenses of similar

04  gravity and magnitude with respect to their threat to the public, as well as comply with

05  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

06  date "unless it determines that the gravity of current convicted offense or offenses, or the

07  timing and gravity of current or past convicted offense or offenses, is such that consideration

08  of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

09  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

10  dates" which take into account the number of victims of the offense as well as other factors in

11  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

12  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

13  § 2402, *et seq*.

14          Accordingly, the Board is guided by the following regulations in making a

15  determination whether a prisoner is suitable for parole:

16          (a) General. The panel shall first determine whether the life
        prisoner is suitable for release on parole. Regardless of the
17          length of time served, a life prisoner shall be found unsuitable
        for and denied parole if in the judgment of the panel the
18          prisoner will pose an unreasonable risk of danger to society if
        released from prison.

19
        (b) Information Considered. All relevant, reliable information
20          available to the panel shall be considered in determining
        suitability for parole. Such information shall include the
21          circumstances of the prisoner's social history; past and present
        mental state; past criminal history, including involvement in
22          other criminal misconduct which is reliably documented; the
        base and other commitment offenses, including behavior before,
        during and after the crime; past and present attitude toward the

REPORT AND RECOMMENDATION - 9

01           crime; any conditions of treatment or control, including the use
of special conditions under which the prisoner may safely be
02           released to the community; and any other information which
bears on the prisoner's suitability for release. Circumstances
03           which taken alone may not firmly establish unsuitability for
parole may contribute to a pattern which results in a finding of
04           unsuitability.

05  15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

06  factors to further assist the Board in analyzing whether an inmate should be granted parole,

07  although "the importance attached to any circumstance or combination of circumstances in a

08  particular case is left to the judgment of the panel." 15 CCR § 2402(c).

09        In examining its own statutory and regulatory framework, the California Supreme

10  Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

11  "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

12  current threat to public safety, and not merely whether some evidence confirms the existence

13  of certain factual findings." *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).  The court also

14  asserted that the Board's decision must demonstrate "an individualized consideration of the

15  specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

16  factors that forms the crux of the parole decision; the significant circumstance is how those

17  factors interrelate to support a conclusion of current dangerousness to the public." *Id*. at

18  1204-05, 1212.  As long as the evidence underlying the Board's decision has "some indicia of

19  reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

20  California courts have continually noted, the Board's discretion in parole release matters is

21  very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

22  regulations, and California law clearly establish that the fundamental consideration in parole

decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at

REPORT AND RECOMMENDATION - 10

01  1205-06.

02      C.      *Summary of Governing Principles*

03          By virtue of California law, petitioner has a constitutional liberty interest in release on

04  parole.  The parole authorities may decline to set a parole date only upon a finding that

05  petitioner's release would present an unreasonable present risk of danger to society if he is

06  released from prison.  Where the parole authorities deny release, based upon an adverse

07  finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

08  if there is "some evidence" in the record to support the parole authority's finding of present

09  dangerousness.  The penal code, corresponding regulations, and California law clearly support

10  the foregoing interpretation.

11      V.      ANALYSIS OF PETITION CHALLENGING THE BOARD'S 2006
                PAROLE DENIAL
12
        A.      *Parties' Contentions*
13
            Petitioner contends the Board violated his right to due process and equal protection by
14
    finding him unsuitable for parole without "some evidence" that he posed an unreasonable risk
15
    of danger to society if released from prison as of January 24, 2006, the date of the parole
16
    hearing.  (*See* Dkt. 1 at 7-10.)  Specifically, petitioner claims the Board improperly relied
17
    upon immutable factors, as well as opinions of the district attorney and victim's family
18
    members. (*See id*. at 9-12 and 21.)  In addition, petitioner contends that California law
19
    "mandates proportionality in the actual amount of time served by prisoners convicted of
20
    murder," and his "disproportionate" period of incarceration has exceeded the matrix for his
21
    offense.  (*See id*. at 35.)  Petitioner also argues the Board's two-year parole denial violated the
22
    *Rutherford* decision, which provided that prisoners who have formerly been denied parole for

01  only one year may not be given multiple-year denials by the Board at future hearings.  (*See id*.

02  at 24.)  Finally, he claims his "life sentence has been altered by the Board to resemble a

03  sentence [for a first-degree murder conviction] of twenty-five years to life, or life without the

04  possibility of parole, thus [constituting] an ex post facto application of law."  (*Id.*)

05          Respondent claims that petitioner does not have a constitutionally protected liberty

06  interest in being released on parole, that the "some evidence" standard is inapplicable in this

07  context, and that even if he does have a protected liberty interest, the Board adequately

08  predicated its denial of parole on "some evidence."  (*See* Dkt. 13 at 3-11.)  Accordingly,

09  respondent argues that petitioner's constitutional rights were not violated by the Board's 2006

10  decision, and the Contra Costa County Superior Court's Order upholding the Board's 2006

11  parole denial was not an unreasonable application of clearly established federal law.  (*See id*.

12  at 4-5 and 11.)

13          B.      *State Court Proceedings*

14          After the Contra Costa County Superior Court denied his habeas petition challenging

15  his 2006 parole denial, petitioner filed habeas petitions in the California Court of Appeal and

16  California Supreme Court.  (*See id*., Exs. 3-5.) Both petitions were summarily denied.  (*See*

17  *id*.)  Respondent admits that petitioner's habeas petition was timely, and petitioner properly

18  exhausted each of his claims before the California Supreme Court.  (*See id*. at 3.)  This Court

19  reviews the Contra Costa County Superior Court's Order upholding the Board's decision to

20  determine whether it meets the deferential AEDPA standards, as it is the last reasoned state

21  court decision.  *See Ylst*, 501 U.S. at 803-04.

22

01          C.      *Petitioner's Due Process Claim*

02          The Board based its decision that petitioner was unsuitable for parole primarily upon

03   his commitment offense, but also cited petitioner's insufficient insight into the offense,

04   insufficient parole plans, and opposition by the district attorney and victim's family.  (*See*

05   Dkt. 1, Ex. A at 83-97.)  The Board's findings tracked the applicable unsuitability and

06   suitability factors listed in § 2402(b), (c) and (d) of title 15 of the California Code of

07   Regulations.  After considering all reliable evidence in the record, the Board concluded that

08   evidence of petitioner's positive behavior in prison did not outweigh evidence of his

09   unsuitability for parole.  (*See id*. at 93.)

10          1.      *Petitioner's Commitment Offense*

11          The Board primarily relied upon the circumstances of the commitment offense to find

12   petitioner unsuitable for parole, and it did not find petitioner's description of the crime to be

13   credible.  (*See id*. at 83-86.)  Specifically, the panel asserted that petitioner "killed his wife in

14   front of his son, even though he's denying that.  All indications in the reports from

15   eyewitnesses indicate that he was holding his son at the time that he shot and killed his

16   [estranged] wife."  (*Id*. at 83.)  Furthermore, the Board pointed out that an eyewitness

17   "described to police … how [petitioner] was threatening to kill the child and himself [in the

18   backyard following the murder] … [and] while [petitioner] does not agree with this version of

19   the offense, this is the version that came out of the Probation Officer's Report and police

20   reports." (*Id*.)

21          The Board found that the offense was "cruel and callous and certainly dispassionate,

22   due to his, number one, killing another human being, and then doing it in front of their child

     and his child…." (*Id*. at 84.)  *See* 15 CCR § 2402(c)(1)(B).  Because petitioner's offense

REPORT AND RECOMMENDATION - 13

01  subjected his son to a trauma that would likely affect him throughout his life, the Board found

02  that petitioner "had a callous disregard for human suffering, times two." (Dkt. 1, Ex. A at 85.)

03  *See* 15 CCR § 2402(c)(1)(D).  The Board also asserted that "the motive for the crime is

04  inexplicable.  [Petitioner] could have just walked away … [gotten] his car jumped and

05  move[d] on with [his] life … But [he] chose not to do that." (Dkt. 1, Ex. A at 85.)  "We can't

06  help but think that there was some calculation going on here, to bring a weapon, a loaded

07  weapon, to your ex-wife's house … That in itself disturbs us.  We are having trouble with

08  that."  (*Id*. at 86.)  *See also* 15 CCR § 2402(c)(1)(E).  The circumstances of petitioner's

09  commitment offense, when combined with petitioner's present refusal to acknowledge the

10  fact that his actions endangered his son as well as his wife, provide "some evidence" to

11  support the Board's conclusion that petitioner would pose an unreasonable risk of danger to

12  society or threat to public safety if released from prison.  (*See* Dkt. 1, Ex. A at 83.)

13          2.      *Petitioner's Insufficient Insight*

14          The Board also relied upon petitioner's insufficient insight into the offense to find him

15  unsuitable for parole.  The Board is required to consider "[a]ll relevant, reliable information

16  available to the panel ... [including a prisoner's] past and present attitude toward the crime."

17  15 CCR § 2402(b).  In addition, if a prisoner has "performed acts which tend to indicate the

18  presence of remorse, such as … indicating that he understands the nature and magnitude of

19  the offense," the Board may consider those acts as circumstances tending to indicate

20  suitability for parole.  *Id*. § 2402(d)(3).  In each case, however, "[t]he importance attached to

21  any circumstance or combination of circumstances … is left to the judgment of the panel."

22  *Id*. § 2402(c) and (d).

01          During the hearing, the Board informed petitioner that "[w]e'd like to see some more

02   insight into this crime … [w]e don't think you're a control freak in terms of trying to control

03   women, but we'd like to see more as far as your insight is concerned into this particular crime,

04   and want you to develop that if you possibly can." (Dkt. 1, Ex. A at 87-88.)  "[I]f it requires

05   therapy, then so be it … you can [go] in and do some therapy…." (*Id*. at 88.)  For example,

06   the Board asserted that "we think that there was more calculation done in this case [than you

07   have admitted].  I mean, the fight was over.  You left.  But you were there and you were there

08   with a loaded weapon, and then panicked, of course, from the sounds of it … because the

09   police had already been called in regards to the first fight." (*Id*. at 89.)  The Board also

10   rejected the conclusions of petitioner's most recent psychological evaluation, which had

11   assessed petitioner's risk of violence if released into the free community as low.  (*See id*., Ex.

12   B at 7.)  Specifically, the Board stated that "we didn't wholesale buy the psychiatric report …

13   [some issues weren't] dealt with, in our opinion." (*Id*., Ex. A at 88.)  Especially in light of the

14   fact that the Board did not find petitioner's version of the commitment offense to be credible,

15   there was "some evidence" in the record to support its conclusion that petitioner had not

16   developed sufficient insight into the offense to be found suitable for parole at the time of his

17   2006 parole hearing.

18          3.     *Petitioner's Parole Plans*

19          The Board acknowledged petitioner's parole plans, but found his employment plans

20   insufficient because three of the four job offers were from non-profit organizations.  (*See id*.)

21   The Board asserted, "number one they don't pay a lot, and, number two … we've all been

22   around a lot of non-profits – they go from feast to famine, depending on whether the United

Way collects enough money or whether their support groups give them money…." (*Id*. at 89-

REPORT AND RECOMMENDATION - 15

01  90.)  The Board also expressed concern that at least one of the jobs was not a full-time

02  position, and petitioner did not know the exact rate of his salary or whether he would receive

03  medical benefits.  (*See id*. at 15-19 and 90.)  As a result, the Board asserted that working at a

04  non-profit upon his release would be "a potential for stressors in [petitioner's] life, and stress

05  is not what [he needs]."  (*Id*. at 90.)

06       Petitioner's fourth job offer was for a clerical position at an investigative service

07  center run by petitioner's ex-sister-in-law in Sacramento.  (*See id*. at 19.)  Although the Board

08  deemed this job "a pretty good alternative" to working at a non-profit organization, it also

09  expressed concern that the position was not located in the East Bay area where petitioner's

10  residence with his brother Robert and sister Ernestine Tatum was located.  (*See id*. at 19 and

11  90.)  The Board therefore found the job insufficient unless the company had business in the

12  Bay area, or petitioner could work from home on a computer.  (*See id*. at 90.)  The Board did

13  note, however, that the Tatums promised to "help [petitioner with] getting [his] driver's

14  license and I.D., and they'll help [him] with transportation."  (*Id*. at 89.)  The Board also

15  admitted that petitioner has a "real good, strong family support group and community support

16  group, as exampled by the letters that are in your file."  (*Id*. at 90.)

17       The applicable regulations provide that a prisoner's "realistic plans for release or

18  [development of] marketable skills that can be put to use upon release" should be considered

19  by the Board as a factor tending to indicate suitability for parole.  *See* 15 CCR § 2402(d)(8).

20  The Board could reasonably conclude that the clerical position in Sacramento was

21  "unrealistic" absent evidence that petitioner could work near his residence in the Bay area, or

22  work remotely.  (*See* Dkt. 1, Ex. A at 90.)  The Board could also reasonably conclude that,

without additional details regarding salary and medical benefits, petitioner's job offers from

REPORT AND RECOMMENDATION - 16

01   non-profit organizations were too unreliable.  (*See id*. at 89-90.)  Accordingly, there was

02   "some evidence" evidence in the record to support the Board's finding that petitioner's parole

03   plans were insufficient at the time of the 2006 parole hearing.

04       4.       *Opposition by the District Attorney and Victim's Surviving Family Members*

05       Petitioner argues that the Board erred by considering opposition to petitioner's release

06   on parole by the Contra Costa County Deputy District Attorney, as well as the victim's

07   mother and son.  (*See* Dkt. 1 at 21.)  Specifically, the district attorney argued that petitioner

08   was armed with a loaded gun at the time of the offense because he was planning to have a

09   confrontation with his wife, and "[h]e's got a problem with women and he hasn't even come

10   close to addressing it…."  (*Id*., Ex. A at 55.)  The victim's mother told the Board she sees "no

11   basic change in what this Inmate would have to offer to either his son, to society, or to this

12   family if released on parole."  (*Id*. at 76.)  Finally, petitioner's son, who was a grown man at

13   the time of the hearing, argued that petitioner's efforts to become involved in his life since

14   petitioner killed his mother have been minimal, and that petitioner's three job offers from

15   non-profit organizations were unreliable.  (*See id*. at 77-82.)

16       In making its suitability determination, the Board must "take into account all pertinent

17   information and input about the particular case from the inmate's victims, the officials

18   familiar with his or her criminal background, and other members of the public who have an

19   interest in the grant or denial of parole to this prisoner."  *In re Dannenberg,* 34 Cal.4th 1061,

20   1086 (2005).  California law affords a deceased victim's next of kin or immediate family

21   members the opportunity to make a statement at the prisoner's parole hearing.  *See* 15 CCR

22   § 2029.  In addition, a prosecutor may attend a parole hearing to represent "the interests of the

people," and may "comment on the facts of the case and present an opinion about the

01   appropriate disposition." *See* Cal. Penal Code § 3041.7; 15 CCR § 2030.  *See also*

02   *Rosenkrantz v. Marshall,* 444 F. Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (noting that in the

03   absence of other reliable evidence of unsuitability in the record, opposition by law

04   enforcement based upon the nature of the commitment offense does not constitute "some

05   evidence" to support parole denial).  Because the Board relied upon other reliable evidence of

06   petitioner's unsuitability for parole, in addition to its consideration of opposition by law

07   enforcement and the victim's surviving family members, its finding that petitioner would

08   present an unreasonable risk of danger to society if released on parole was not arbitrary and

09   capricious.

10          5.      *Petitioner was Afforded Due Process of Law*

11          Contrary to petitioner's argument that the Board failed to consider or give appropriate

12   weight to the parole suitability rules which favored petitioner, the Board noted that petitioner

13   "had no previous [criminal] record, and [he] should be commended for that."  (*See* Dkt. 1, Ex.

14   A at 86.)  In addition, it observed that "[petitioner's] institutional behavior has been

15   outstanding."  (*Id*.)  Specifically, petitioner was only involved in a couple incidents of "minor

16   misconduct" in prison over twenty years before the hearing, and he has never committed any

17   major rule violation during his incarceration.  (*See id*.)  The Board also commended petitioner

18   for programming well, completing ample self-help, and putting together programs designed to

19   help youth in the community.  (*See id*. at 32-34, 86-87, and 93.)  It is therefore an inaccurate

20   characterization of the record to say that the Board failed to provide petitioner with an

21   individualized consideration of all relevant factors, and relied upon immutable facts to find

22   him unsuitable for parole.  (*See* Dkt. 1 at 9-12.)

REPORT AND RECOMMENDATION - 18

01          As mentioned above, however, the Board has broad discretion to determine how

02   suitability and unsuitability factors interrelate to support its conclusion of current

03   dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.  Although petitioner has

04   "done exceptionally well and should be commended for … all the programming [he has]

05   done," the Board found that he would pose an unreasonable risk of danger to society or threat

06   to public safety if released from prison within the following two years.  (Dkt. 1, Ex. A at 83

07   and 93.)  Furthermore, the Board could reasonably recommend additional therapy to help

08   petitioner gain insight into the crime, because the Board is in the best position to evaluate the

09   credibility of petitioner's version of the offense.  (*See id.* at 93-94.)  The Board's parole

10   decision was therefore supported by "some evidence" in the record.

11          D.      *Petitioner's Equal Protection Claim*

12          Petitioner also contends that the Board's failure "to fix his term" and set a parole date

13   violated his "right to equal protection of the law under the Fourteenth Amendment of the

14   United States Constitution…."  (Dkt. 1 at 28.)  Specifically, he claims that California law sets

15   forth a "matrix, which codifies the more commonplace variations of murder … [and]

16   demonstrates that different instances of murder can be, and must be meaningfully compared."

17   (*Id*. at 35-36.)  As a result, he argues the Board's denial of parole violated the matrix for his

18   offense, and caused him to serve a disproportionate sentence.  (*See id*. at 1 and 36-37.)

19          The petition offers little support for petitioner's equal protection claim, and respondent

20   fails to address this issue on the merits.  (*See id*. and Dkt. 13.)  Contrary to petitioner's

21   assertions, California law does not require the Board to conduct a comparative analysis of the

22   period of confinement served by other prisoners with similar crimes, nor does it require the

Board to refer to the sentencing matrices.  *See In re Dannenberg*, 34 Cal.4th 1061, 1083-84

01 (2005) (holding whether an inmate poses a current danger is not dependent upon whether his

02 commitment offense was more or less egregious than other, similar crimes).  Instead, the

03 Board is required to review the specific facts of each case and to make an individualized

04 determination of whether that prisoner is suitable for parole.  *See Law*rence, 44 Cal.4th at

05 1221.  Petitioner's allegations, without more, fail to establish an equal protection violation.

06 The Court therefore finds that petitioner's claim lacks merit.

07         E.      *Petitioner's* Rutherford *Claim*

08         Petitioner claims that the Board violated the "*In re Rutherford* decision" by denying

09 him another parole consideration hearing for two years without describing a significant

10 change in circumstances on the record during his 2006 hearing, because he was denied parole

11 for only one year at his previous parole hearing.  (*See* Dkt. 1 at 24.)  As explained below,

12 petitioner's arguments are unavailing, and the California Court of Appeal has reversed the

13 decision upon which petitioner relies.

14         The "*Rutherford* decision" refers to a decision of the Marin County Superior Court in

15 a case involving a life-term inmate at the San Quentin State Prison who filed a habeas corpus

16 petition contending that the Board failed to conduct his subsequent parole consideration

17 hearing in a timely manner in violation of his due process rights and the requirements of

18 California Penal Code section 3041.5(b)(2).  *See In re Inez Tito Lugo*, 164 Cal.App.4th 1522,

19 1529 (2008).[2]  The trial court granted a motion by Rutherford for class certification, and

20 defined the class as all prisoners serving indeterminate terms of life with the possibility of

21 parole who have approached or exceeded their minimum eligible parole dates without

22 
_____

        [2] An order entered by the Marin County Superior Court on May 5, 2006, appointed Inez Tito Lugo as
the class representative in place of original petitioner Jerry Rutherford, who had died since the commencement
of the litigation.  *See id.* at 1532.

REPORT AND RECOMMENDATION - 20

01  receiving their parole hearings within the time required by the California Penal Code.  *See id*.

02  at 1529-30.

03      One of the disputed issues in the *Rutherford* case involved the validity of multi-year

04  denials of parole by the Board following a one-year denial of parole at a prior hearing.  *See id*.

05  at 1531.  Under the requirements of section 3041.5(b)(2) of the California Penal Code in

06  effect at the time of the trial court's decision, if the Board gave a prisoner a multi-year denial,

07  that prisoner's next scheduled parole suitability hearing would not be conducted for two to

08  five years.  *See* Cal. Penal Code § 3041.5(b)(2)(A)-(B) (effective to November 4, 2008).[3]  In

09  contrast, if the Board issued a one-year denial, the matter was heard on an annual basis.  *See*

10  *id*.  The class of prisoners (hereinafter "petitioners") in *Rutherford* argued that the Board

11  should not issue multi-year denials in cases in which inmates had previously received a one-

12  year parole denial absent a statement of a "significant change in circumstances" on the record,

13  because the Board seemed to be issuing multi-year denials as a means of reducing its own

14  hearing backlog.  *See Lugo*, 164 Cal.App.4th at 1531.  In response, the Board asserted that

15  individual parole decisions should be left to the discretion of the hearing panel, and requiring

16  the Board to justify a multi-year denial following a one-year denial by identifying a

17  "significant change in circumstances" would improperly tether the Board's discretion to the

18  decisions of prior panels.  *See id*. at 1531-32.  By an order dated May 5, 2006, the trial court

19  ruled in favor of petitioners, and the Board appealed.  *See id*. at 1532.

20

21

_____

22      [3] Text amendments to section 3041.5(b)(2) of the California Penal Code became effective on November 5, 2008, approximately four months after the California Court of Appeal's July 21, 2008, decision in *Lugo*.  The amended version of the statute authorizes the Board to postpone a prisoner's next hearing for three, five, seven, ten, or fifteen years after any hearing at which parole was denied.  *See* Cal. Penal Code § 3041.5(b)(2).

01        The California Court of Appeal reversed, finding that the trial court's order "violated

02   the separation of powers and intrudes upon the inherent discretion afforded to the Board to

03   decide parole matters." *Id.* at 1540.  After summarizing the requirements set forth by

04   California Penal Code section 3041.5, the Court of Appeal observed that "[t]he statute

05   contains no requirement that the Board must find a significant change in circumstances

06   justifying a multi-year denial following a one-year denial." *Id.* at 1537.[4]  "The Board's

07   decision to defer annual parole consideration hearings is guided by the same criteria used to

08   determine parole suitability … [and the] reasons for postponing the next scheduled parole

09   hearing need not be completely different from the reasons for denying parole suitability."

10   *Lugo*, 164 Cal.App.4th at 1537.  Because the requirements of procedural due process impose

11   some limitations upon the executive branch's broad discretionary powers in parole matters,

12   the Court of Appeal held that "[t]he 'some evidence' standard of review governs

13   consideration of a Board decision to postpone the next scheduled parole hearing by issuing a

14   multi-year denial." *Id.*

15        Therefore, a reviewing court might be justified in closely scrutinizing a decision

16   issuing a multi-year denial in the case of an inmate who has "consistently received one-year

17   denials of parole and then received a multi-year denial" to ensure that the Board's decision

18   was supported by "some evidence" in the record, but that reviewing court must remain

19   mindful that "some evidence is all that is required." *Id.* at 1539, fn.9.  "A panel of the Board

20   need not point to additional evidence supporting its departure from the discretionary decisions

21   of earlier panels." *Id.*

22

---

[4] The revised version of California Penal Code § 3041.5 also omits such a requirement. *See* fn. 3, *supra*; Cal. Penal Code 3041.5(b)(2) (effective November 5, 2008).

01          Accordingly, this Court must determine whether there was "some evidence" in the

02   record to support the Board's decision to postpone petitioner's next parole hearing for two

03   years, even though he received one-year denials at prior hearings, pursuant to the California

04   Court of Appeal's decision in *Lugo*.  (*See* Dkt. 1, Ex. A at 93.)  *See also Lugo*, 164

05   Cal.App.4th at 1537.  During petitioner's 2006 hearing, the Board explained that a multi-year

06   denial was appropriate because "it's not reasonable to expect that parole would be granted at a

07   hearing during the following two years, specifically based on the commitment offense,

08   murdering your wife in front of your son and bringing that gun to that event.  It makes no

09   sense at all."  (Dkt. 1, Ex. A at 93-94.)  In addition, the Board recommended that petitioner

10   "work on getting therapy [to gain] insight" into the offense, because the Board suspected that

11   some premeditation or calculation by petitioner was involved in the murder, and petitioner's

12   version of the crime differed significantly from the facts set forth by the Probation Officer's

13   Report and law enforcement.  (*See id*. at 94.)  Based upon the Board's reasoning as described

14   in its decision, there was "some evidence" in the record to support the Board's finding that a

15   multi-year denial of parole was appropriate in petitioner's case.

16          F.     *Petitioner's* Ex Post Facto *Claim*

17          Petitioner also claims that by denying him a parole date, the Board has "altered … [his

18   sentence] to resemble a sentence of twenty-five-years-to-life, or life without the possibility of

19   parole, thus constituting an ex post facto application of law."  (*Id*. at 35.)  Specifically, he

20   states that "because there appears to be no other lawful explanation for [the Board's parole

21   denial, the Board must have imposed] the greater penalty of twenty-five years to life which is

22   reserved for prisoners convicted of first degree murder on or after November 8, 1978, and/or

     life without the possibility of parole."  (*Id*. at 37.)

REPORT AND RECOMMENDATION - 23

01          Petitioner's claim fails for multiple reasons.  First, Article I of the United States

02   Constitution provides that neither Congress nor any state shall pass an ex post facto law.  U.S.

03   Const. Art. I, § 9, cl. 3, Art. I, §10, cl. 1.  Hence, the Ex Post Facto Clause, by definition,

04   applies to the Legislative Branch, not to the courts or an administrative body, such as the

05   Board of Parole Hearings.  *See Rogers v. Tennessee,* 532 U.S. 451, 460 (2001) (holding "[t]he

06   Ex Post Facto Clause, by its own terms, does not apply to courts"); *Marks v. United States,*

07   430 U.S. 188, 191 (1977) (holding "[t]he Ex Post Facto Clause is a limitation upon the

08   powers of the Legislature, and does not of its own force apply to the Judicial Branch of

09   government.") (citations omitted)); *Lagrand v. Stewart,* 133 F.3d 1253, 1260 (9th Cir.)

10   (holding "[t]he Ex Post Facto Clause does not apply to court decisions construing statutes."),

11   *cert. denied,* 525 U.S. 971 (1998).

12          Moreover, the Board has not increased petitioner's punishment.  The Ex Post Facto

13   Clause prohibits the retrospective application of criminal statutes that change the definition of

14   a crime or enhance the punishment for a criminal offense.  *See Collins v. Youngblood*, 497

15   U.S. 37, 41 (1990) ("Although the Latin phrase 'ex post facto' literally encompasses any law

16   passed 'after the fact,' it has long been recognized ... that the constitutional prohibition on ex

17   post facto laws applies only to penal statutes which disadvantage the offender affected by

18   them.")  Petitioner was sentenced to a term of seventeen-years-to-life.  While petitioner might

19   have hoped or expected to be released sooner, the Board's decision to deny him a parole

20   release date because he would present an unreasonable risk of danger to society has not

21   enhanced or otherwise "altered" his punishment.  Accordingly, the Board's decision denying

22   petitioner parole did not violate the Ex Post Facto Clause, and petitioner's contention in this

respect should be denied.

01          G.      *Contra Costa County Superior Court Decision*

02          In a reasoned decision denying petitioner's request for habeas relief, the Contra Costa

03   County Superior Court concluded that "the [Board] properly considered all the relevant facts,

04   and its decision was fully supported by the record." (Dkt. 1, Ex. I at 3.)  "Although there

05   were conflicting accounts of whether Petitioner was holding his three-year-old son during the

06   shooting, the panel could choose to disbelieve Petitioner's version … and accept the evidence

07   that he was holding the child during the shooting." (*Id*. at 4.)  After reviewing the applicable

08   suitability and unsuitability factors, the superior court concluded that "the [Board] considered

09   all the relevant factors in reaching its decision and did not act arbitrarily." (*Id*. at 5.)  In

10   addition, the superior court held that petitioner's argument that the Board erred by not

11   "comparing Petitioner's crime to other second-degree murders or to its base matrices" was

12   unavailing, and that petitioner's *Rutherford* claim lacked merit. (*See id*. at 6.)  Accordingly,

13   the superior court denied the petition. (*See id*. at 7.)

14   VI.     PETITION CHALLENGING THE BOARD'S 2008 PAROLE DENIAL

15          Petitioner has filed another federal petition for writ of habeas corpus in this case

16   claiming that his federal due process rights were violated when the Board again denied parole

17   at his April 29, 2008, parole hearing, because there was no evidence in the record to support

18   the decision.[5] (*See* Dkt. 18 at 10-20.)  Along with his federal petition, petitioner filed the

19   2008 parole hearing transcript, his most recent psychological evaluation prepared by Dr. Geca

20   on March 29, 2008, and the decisions denying his state court habeas petitions. (*See id*., Exs.

21   A, B, and H.)  Specifically, the Contra Costa County Superior Court denied his habeas

22

_____

[5] The petition challenging the Board's 2008 parole denial did not present any other claims that were not addressed by this Court's discussion of the prior petition *supra*.

REPORT AND RECOMMENDATION - 25

01  petition challenging the 2008 parole denial on January 22, 2009, and his habeas petitions filed

02  in the California Court of Appeal and California Supreme Court were both summarily denied.

03  (*See* Dkt. 18, Ex. H.)   He has also filed a separate motion to proceed *in forma pauperis*.  (*See*

04  Dkt. 19.)

05         It is not clear whether petitioner intended his federal habeas challenge to the 2008

06  denial to be filed in this case, along with his challenge to the 2006 denial; or intended to

07  commence a new action.  In fact, the Clerk filed it in this case.

08         While the Court could order it re-filed as a separate case, as a practical matter nothing

09  recommends doing so.  For the reasons discussed below, his challenge to the 2008 denial has

10  even less merit than his challenge to the 2006 denial.  Resolving it here has the multi-faceted

11  attraction of expeditious resolution, preserving the scarce resources of the parties and the

12  court, and at the same time not depriving petitioner of fairness in any respect.  His federal

13  habeas petition was timely, and because this Court finds that it should be denied on the merits,

14  it is unnecessary to determine whether all petitioner's federal claims were exhausted.  *See* 28

15  U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

16  notwithstanding the failure of the applicant to exhaust the remedies available in the courts of

17  the State.").

18         Rule 4 of the Rules Governing Section 2254 Cases requires the undersigned to dismiss

19  a federal habeas petition "[i]f it plainly appears from the petition and any attached exhibits

20  that the petitioner is not entitled to relief in the district court…."  Rule 4 of the Rules

21  Governing Section 2254 Cases.  Accordingly, this Court must review the petition challenging

22  the Board's 2008 parole denial, as well as the attached exhibits, to determine whether "it

    plainly appears" that petitioner is not entitled to relief.

REPORT AND RECOMMENDATION - 26

01          The 2008 habeas petition and exhibits do not demonstrate any enhancement of the

02    suitability factors since the 2006 parole hearing, and even contain stronger evidence of

03    petitioner's unsuitability for parole.  Although the Board admitted that petitioner's parole

04    plans in 2008 were viable, the Board's findings concerning petitioner's commitment offense

05    and opposition by the district attorney remain consistent with its 2006 parole denial, and the

06    Board expressed increased concern regarding petitioner's lack of insight into the commitment

07    offense.  (*See* Dkt. 18, Ex. A at 96-100 and 102-109.)  For example, the Board noted that

08    petitioner had not taken any steps to seek one-on-one therapy since the 2006 parole hearing,

09    although the prior panel had recommended additional therapy to help petitioner develop

10    insight regarding the crime.  (*See id*. at 50-51.)  The Board also discussed numerous passages

11    from the 2008 psychological evaluation conducted by Dr. Geca, which examined petitioner's

12    insufficient insight in greater detail than any of petitioner's eight prior evaluations.  (*See id*. at

13    102-09; *id*., Ex. B at 2-9; Dkt. 1, Ex. B.)  *See also* 15 CCR § 2402(b); 15 CCR § 2402(d)(3).

14          Specifically, Dr. Geca diagnosed petitioner as narcissistic, and found that "whenever

15    he addresses the issue of remorse and culpability, he prefaces it by denigrating his wife and he

16    emphasizes her alleged sexual indiscretions.  He then presents himself as the victim of her

17    manipulation and trickery … [thereby giving the] impression of projecting blame or justifying

18    his actions and thus taking only a partial responsibility for the murder."  (Dkt. 18, Ex. B at 8.)

19    As evidence that petitioner has failed to gain insight into the murder, the psychologist pointed

20    out that "[a]lthough he clearly says he holds himself accountable for the crime and blames

21    himself, he seems unable or unwilling to answer why he shot his wife."  (*Id*.)  Thus, the

22    psychologist concluded that petitioner's "insight into his situation, his criminal behavior and

      potential impact upon others needs improvement."  (*Id*. at 2.)  As a result of Dr. Geca's

REPORT AND RECOMMENDATION - 27

01 findings regarding petitioner's lack of insight into the offense, the Board chose not to rely

02 upon Dr. Geca's assessment that petitioner would present a low risk of recidivism, and instead

03 found petitioner unsuitable for parole.  (*See id*., Ex. A at 105-109.)

04       As mentioned above, the Contra Costa County Superior Court upheld the Board's

05 decision to deny parole in a reasoned decision on January 22, 2009.  (*See id*., Ex. H at 1-8.)

06 Specifically, the superior court found that "[t]he Board was amply supported in concluding

07 that petitioner has failed to gain insight into his situation, his criminal behavior and its impact

08 on others … None of this inspires any confidence that, if he perceived himself to be offended

09 or provoked in a relationship again, he would not explode again into violence and rage."  (*Id*.

10 at 8.)  As a result, the superior court concluded that "there was some evidence to support the

11 Board's conclusion that the petitioner's current failure to show insight, and continued

12 adherence to the mindset he had when he committed a heinous, callous and senseless murder,

13 show he presents a continued unreasonable public safety risk."  (*Id*.)

14       Accordingly, this Court finds that "it plainly appears from the petition and [the]

15 attached exhibits," when viewed in the context of this Court's ruling *supra* regarding

16 petitioner's 2006 habeas petition, that "petitioner is not entitled to relief" based upon his 2008

17 habeas petition.  *See* Rule 4 of the Rules Governing Section 2254 Cases.  Petitioner's 2008

18 habeas petition should therefore be summarily dismissed under Rule 4.  (*See* Dkt. 18.)

19      VII.   CONCLUSION

20       As stated above, it is beyond the authority of a federal habeas court to determine

21 whether evidence of suitability outweighs the circumstances of the commitment offense,

22 together with any other reliable evidence of unsuitability for parole.  The Board has broad

discretion to determine how suitability and unsuitability factors interrelate to support its

REPORT AND RECOMMENDATION - 28

01  conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

02  Although the Board praised petitioner's good behavior in prison, it determined that petitioner

03  remains unpredictable, and therefore an unreasonable risk of danger to society if released.

04  Because the state court decisions upholding the Board's findings satisfied the "some

05  evidence" standard, there is no need to reach respondent's argument that another standard

06  applies.

07        Given the totality of the Board's findings, there is "some evidence" that as of January

08  24, 2006, and April 29, 2008, the dates of the two parole decisions challenged in this case,

09  petitioner's release on parole would have posed an unreasonable risk of danger to society or

10  threat to public safety if released from prison.  The Contra Costa County Superior Court's

11  Orders upholding the Board's decisions were not contrary to, or an unreasonable application

12  of, clearly established federal law, or based on an unreasonable determination of facts.  I

13  therefore recommend that the Court find that petitioner's due process rights were not violated,

14  and that it deny his habeas petitions, strike petitioner's motion to proceed *in forma pauperis*

15  as moot, and dismiss this action with prejudice.

16        This Report and Recommendation is submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

18  after being served with this Report and Recommendation, any party may file written

19  objections with this Court and serve a copy on all parties.  Such a document should be

20  captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

21  objections within the specified time may waive the right to appeal the District Court's Order.

22

01    *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

02 Report and Recommendation.

03        DATED this 19th day of November, 2009.

04

05

06                        JOHN L. WEINBERG
                        United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION - 30